# Exhibit A to Notice of Removal (Petition)

**ADR-106**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY      STATE BAR NUMBER: 206473<br>NAME: Michael J. Weiss<br>FIRM NAME: Concentric Law, P.C.<br>STREET ADDRESS: 30700 Russell Ranch Rd., Suite 250<br>CITY: Westlake Village      STATE: CA      ZIP CODE: 91362<br>TELEPHONE NO.: 310-210-1259      FAX NO.:<br>EMAIL ADDRESS: mike@concentriclaw.com<br>ATTORNEY FOR *(name):* Club Q Pictures, LLC, Jeff Kalligheri, Denis O'Sullivan | *FOR COURT USE ONLY*<br><br>**Electronically FILED by<br>Superior Court of California,<br>County of Los Angeles<br>6/02/2026 11:37 AM<br>David W. Slayton,<br>Executive Officer/Clerk of Court,<br>By D. Williams, Deputy Clerk** |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: 111 N. Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

PETITIONER: Club Q Pictures, LLC, Jeff Kalligheri, and Denis O'Sullivan
RESPONDENT: Writers Guild of America, West, Inc., and Sarah Smith

| |
|---|
| **PETITION TO** ☐ **CONFIRM** ☐ **CORRECT** ☒ **VACATE**<br>**CONTRACTUAL ARBITRATION AWARD** |

| | |
|---|---|
| **Jurisdiction** *(check all that apply):*<br>  ☐ **Action is a limited civil case** (does not exceed $35,000)<br>    Amount demanded   ☐    does not exceed $10,000<br>                  ☐    exceeds $10,000<br>  ☒ **Action is an unlimited civil case** (exceeds $35,000) | CASE NUMBER:<br><br>26STCP02112 |

| |
|---|
| **NOTICE: You may use this form to request that the court confirm, correct, or vacate an award in an arbitration conducted pursuant to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq. and that does not involve an attorney-client fee dispute. If you are requesting court action after an attorney-client fee arbitration award, please read Alternative Dispute Resolution form ADR-105, *Information Regarding Rights After Attorney-Client Fee Arbitration.*** |

1. **Petitioner and respondent.** Petitioner *(name each):*
   Club Q Pictures, LLC, Jeff Kalligheri, an individual, and Denis O'Sullivan, an individual

   alleges and requests relief against respondent *(name each):*
   Writers Guild of America, West, Inc., and Sarah Smith

2. **Contractual arbitration.** This petition requests the court to confirm, correct, or vacate an award in an arbitration conducted according to an agreement between the parties that is subject to Code of Civil Procedure section 1285 et seq.

3. Pending or new action.
   a. ☐   A court case is already pending, and this is a petition filed in that action. *(If so, proceed to item 4.)*
   b. ☒   This petition commences a new action. *(If so, complete items 3b(1) through 3b(4).)*

   (1) **Petitioner's capacity.** Each petitioner named in item 1 is an individual,
       ☒   except petitioner *(state name and complete one or more of the following)* Club Q Pictures, LLC
       (a) ☐   is a corporation qualified to do business in California.
       (b) ☐   is an unincorporated entity *(specify):*
       (c) ☐   is a representative *(specify):*
       (d) ☒   is *(specify other capacity):* Limited Liability Company

   (2) **Respondent's capacity.** Each respondent named in item 1 is an individual,
       ☒   except respondent *(state name and complete one or more of the following)* Writers Guild of America, West, Inc.
       (a) ☐   is a business organization, form unknown.
       (b) ☒   is a corporation.
       (c) ☐   is an unincorporated entity *(specify):*
       (d) ☒   is a representative *(specify):* of Sarah Smith
       (e) ☐   is *(specify other capacity):*

**Page 1 of 3**

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>ADR-106 [Revised January 1, 2024] | **PETITION TO CONFIRM, CORRECT, OR VACATE<br>CONTRACTUAL ARBITRATION AWARD**<br>**(Alternative Dispute Resolution)** | Code of Civil Procedure, § 1285 et seq. |

| PETITIONER: Club Q Pictures, LLC, Jeff Kalligheri, and Denis O'Sullivan | CASE NUMBER: |
|---|---|
| RESPONDENT: Writers Guild of America, West, Inc., and Sarah Smith | |

3. b. (3) **Amount or property in dispute.** This petition involves a dispute over *(check and complete all that apply)*
    (a) [ x ] the following amount of money *(specify amount):* $ 404,599.00
    (b) [   ] property *(if the dispute involves property, complete both of the following)*
       (i) consisting of *(identify property in dispute)*:
       (ii) having a value of *(specify value of property in dispute)*: $

   (4) [ x ] **Venue.** This court is the proper court because *(check (a) or (b))*:
    (a) [ x ] this is the court in the county in which the arbitration was held.
    (b) [   ] the arbitration was not held exclusively in any county of California, or was held outside of California,
       **and** *(check one or more of the following)*:
       (i) [   ] this is the court in the county where the agreement was made.
       (ii) [   ] this is the court in the county where the agreement is to be performed.
       (iii) [   ] the agreement does not specify a county where it is to be performed and was not made in any county in California, and the following party resides or has a place of business in this county *(name of party):*

       (iv) [   ] the agreement does not specify a county where it is to be performed and was not made in any county in California, and no party to this action resides or has a place of business in California.

4. **Agreement to arbitrate.**
   a. **Date**. Petitioner and respondent entered into a written agreement on or about *(date):* 11/19/2020 (WGAW)
   b. [ x ] **Attachment.** A copy of the agreement is submitted as Attachment 4(b) and incorporated herein by this reference.
   c. **Arbitration provision.** Paragraph 10, 11 of the agreement provides for arbitration of disputes arising out of the agreement as follows *(either copy the arbitration provision in full or summarize the provision):*
   See copy of relevant provisions attached.

5. **Dispute subject to arbitration.** A dispute arose between petitioner and respondent concerning the following matter covered by the agreement to arbitrate *(summarize the dispute):*
Claim by Writers Guild of America, West, Inc., and writer Sarah Smith against Club Q Pictures, LLC, Jeff Kalligheri and Denis O'Sullivan for unpaid compensation under writer's alleged individual employment agreement.

6. **Arbitrator.** The following person was duly selected or appointed as arbitrator *(name of each arbitrator):*
Frederic R. Horowitz

7. **Arbitration hearing.** The arbitration hearing was conducted as follows *(complete both of the following)*:
   a. **Date** *(each date of arbitration):* 8/7, 8/8, and 9/5 of 2025
   b. **Location** *(city and state where arbitration was conducted)*:
   Virtually via Zoom based in Los Angeles, CA

8. **Arbitration award.**
   a. **Date of award.** The arbitration award was made on *(date):* 4/6/2026
   b. **Terms of award.** The arbitration award *(check one or more of the following)*
    (1) [ x ] requires [ x ] petitioner [   ] respondent to pay the other party this amount: $ 404,599.00
    (2) [   ] requires neither party to pay the other anything.
    (3) [   ] is different as to different petitioners and respondents.
    (4) [   ] provides *(specify other terms or check item 8(c) and attach a copy of the award):*

   c. [ x ] **Attachment of Award.** A copy of the award is submitted as Attachment 8(c).

9. **Service of award.**
   a. The signed award or an accompanying document indicates that the award was served on petitioner on *(date):* 4/6/2026
   b. [   ] Petitioner alleges that a signed copy of the award was actually served on *(date):*

| PETITIONER:  Club Q Pictures, LLC, Jeff Kalligheri, and Denis O'Sullivan | CASE NUMBER: |
|---|---|
| RESPONDENT:  Writers Guild of America, West, Inc., and Sarah Smith | |

10. **Petitioner requests that the court** *(check all that apply)*

a. ☐ **confirm the award, and enter judgment according to it.**

b. ☐ **correct the award and enter judgment according to the corrected award, as follows:**

(1) The award should be corrected because *(check all that apply)*

(a) ☐ the amount of the award was not calculated correctly, or a person, thing, or property was not described correctly.

(b) the arbitrator exceeded his or her authority.

(c) the award is imperfect as a matter of form.

(2) The facts supporting the grounds for correcting the award alleged in item 10b(1) are as follows *(if additional space is required, check here* ☐ *and submit facts on an attachment labeled 10b(2)):*

(3) The award should be corrected as follows *(if additional space is required, check here* ☐ *and describe requested correction on an attachment labeled 10b(3)):*

c. ☒ **Vacate (cancel) the award.**

(1) The award should be vacated because *(check all that apply)*

(a) ☐ the award was obtained by corruption, fraud, or other unfair means.

(b) ☐ an arbitrator was corrupt.

(c) ☐ the misconduct of a neutral arbitrator substantially prejudiced petitioner's rights.

(d) ☒ the arbitrator exceeded his or her authority, and the award cannot be fairly corrected.

(e) ☐ the arbitrator unfairly refused to postpone the hearing or to hear evidence useful to settle the dispute.

(f) ☐ an arbitrator failed to disclose within the time for disclosure a ground for disqualification of which the arbitrator was then aware.

(g) ☐ an arbitrator should have disqualified himself or herself after petitioner made a demand to do so.

(2) The facts supporting the grounds for vacating the award alleged in item 10c(1) are as follows *(if additional space is required, check here* ☐ *and submit facts on an attachment labeled 10c(2)):*
The arbitrator re-wrote a controlling provision in the COA that superseded the alleged individual employment agreement.

(3) Petitioner ☐ does ☒ does not request a new arbitration hearing.

d. ☐ **Award petitioner interest** from *(date):*

(1) ☐ at the statutory rate.

(2) ☐ at rate of _____ % per year.

e. ☐ **Award petitioner costs of suit**

(1) ☐ in the amount of: $

(2) ☐ according to proof.

f. ☐ **Award petitioner attorney fees incurred in this action** *(check only if attorney fees are recoverable in this action according to statute or the parties' agreement)*

(1) ☐ in the amount of: $

(2) ☐ according to proof.

g. ☒ **Award petitioner the following other relief** *(describe relief requested; if additional space is required, check here* ☐ *and describe relief on an attachment labeled 10g):*
That the Certificate of Authorship ("COA") dated May 6, 2022 supersedes the alleged individual employment agreement, and the amount in dispute is therefore only $31,250.00 or the applicable WGA minimum scale for a rewrite.

11. **Pages and attachments.** *Number of pages attached:* 50

Date: June 2, 2026

| Michael J, Weiss, Esq. | ▶ | |
|---|---|---|
| (TYPE OR PRINT NAME) | | (SIGNATURE OF PETITIONER OR ATTORNEY) |

ADR-106 [Rev. January 1, 2024]

**PETITION TO CONFIRM, CORRECT, OR VACATE CONTRACTUAL ARBITRATION AWARD**
**(Alternative Dispute Resolution)**

**Page 3 of 3**

**For your protection and privacy, please press the Clear This Form button after you have printed the form.**     Print this form     Save this form     Clear this form

Attachment 4(b)

in the manner prescribed in Article 8.  The Guild only shall have the right to waive any of the provisions of this Basic Agreement on behalf of or with respect to any individual writer.

## ARTICLE 10 - GRIEVANCE AND ARBITRATION

### A.    MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION (GENERAL)

Except as otherwise specifically provided in this Article or elsewhere in this Basic Agreement, the following matters shall be submitted to grievance and thereafter to arbitration as hereinafter provided, and no other matters shall be submitted to grievance or arbitration:

1.    Any dispute between the Guild and the Company concerning the interpretation of any of the terms of this Basic Agreement and the application and effect of such terms as determined by an interpretation thereof.

2.    Any alleged breach of any of the terms or provisions of this Basic Agreement by the Guild or the Company.

3.    Any claim by the Guild and a writer, on the one hand, against the Company, on the other hand, for unpaid compensation under the writer's individual employment agreement or loan-out agreement with the Company, or for payment under a purchase agreement with the Company in the case of a professional writer, excluding, however, any claim not related to the writer's services as a writer or not related to the sale of literary material.  (Claims for compensation or payment under an employment, loan-out or purchase agreement shall be referred to hereafter as "**compensation claims**" or "**claims for compensation**.")  Notwithstanding the foregoing, the grievance committee and arbitrator shall not have jurisdiction to render an award for compensation or payment exceeding the sum of four hundred thousand dollars ($400,000.00) for a theatrical or television employment or purchase.  (This amount is herein referred to as the "*jurisdictional maximum*.")  If a compensation claim exceeds the jurisdictional maximum, the claim may nevertheless be submitted to grievance and/or arbitration, but by such submission the Guild and writer waive any award exceeding the jurisdictional maximum and shall have no further claim or right with respect to any amount in excess of the jurisdictional maximum.  A claim for compensation cannot be split nor may more than one (1) grievance or arbitration

proceeding be brought for the purpose of avoiding the jurisdictional maximum.

4.  In any grievance or arbitration proceeding with respect to a claim for compensation brought under subparagraph 3. of this Article 10.A., the Company may, but need not, assert any and all defenses, including defenses based on an alleged right of suspension or termination, and any counterclaim or setoff (hereinafter referred to as "*cross-claim*").  A cross-claim is either mandatory or permissive.  A mandatory cross-claim is one arising out of or related to the pending claim for unpaid compensation.  A permissive cross-claim is any other cross-claim by the Company against the writer.  Provided that the Company has obtained knowledge of the facts upon which the cross-claim is based, the Company shall assert any and all mandatory cross-claims in any arbitration proceeding involving a compensation claim.  If the amount claimed by the Company in a cross-claim exceeds the jurisdictional maximum of four hundred thousand dollars ($400,000.00), the Company shall have the option of submitting such cross-claim to grievance and (whether or not submitted to grievance) to arbitration or to institute an action at law or in equity with respect to such cross-claim.  The Company may, but need not, assert any permissive cross-claim.

5.  Any claim of overpayment by a Company under Article 11.A.9. of this Basic Agreement.[1]

## B.   LIMITATION OF MATTERS SUBJECT TO GRIEVANCE AND ARBITRATION

1.  Except as otherwise provided in this Basic Agreement, disputes under individual employment agreements, loan-out agreements or under purchase agreements with professional writers, involving:

    a.  Company's rights of suspension and termination,

    b.  Company's right to seek or obtain injunctive relief or specific performance,

    c.  any of the warranties or grants of rights made by the writer, or

---

[1] Articles 10.A.5. and 11.A.9. replace Article 13.C. of the 1973 Basic Agreement.

**ARTICLE 10.A.3.**
GRIEVANCE AND ARBITRATION
MATTERS SUBJECT TO
GRIEVANCE AND ARBITRATION
(GENERAL)

d.    any of the rights of the Company to any literary material,

shall not be subject to grievance or arbitration (except as provided to the contrary in Article 16), and the Company reserves all of its legal and equitable rights and remedies with respect thereto.  Any decision in grievance or award in arbitration purporting to determine or affect any of the aforementioned matters shall, to that extent, be of no force or effect whatsoever; provided, however, that if the Company asserts in any grievance or arbitration any defense or cross-claim involving or based upon the alleged exercise of a right of suspension or termination, the same shall be determined in such grievance and arbitration proceeding.

2.    The grievance committee and the arbitrator shall have jurisdiction to determine only such disputes as are submitted for grievance or arbitration under this Basic Agreement, subject to the limitations upon the powers of said grievance committee and arbitrator under this Basic Agreement.  Neither the grievance committee nor the arbitrator shall have the power or jurisdiction to reform, amend or extend the express terms and provisions of this Basic Agreement or of any employment agreement, loan-out agreement or purchase agreement.

## C.    MATTERS SUBJECT TO ARBITRATION BUT NOT GRIEVANCE

Notwithstanding anything elsewhere contained in this Article 10, the following matters shall be submitted to arbitration but not to grievance:

1.    Any dispute as to whether the arbitrator has jurisdiction or whether any matter is arbitrable, provided, however, that the arbitrator may not order an arbitration of any matter not arbitrable as provided above.

2.    Any dispute concerning the credit provisions of this Basic Agreement.  Such disputes are subject to the procedures set forth in Article 11.E. of this Basic Agreement.

3.    Any dispute concerning separation of rights under the provisions of subparagraph 6. of Article 16.A. of this Basic Agreement.

4.    Any dispute concerning allocation of receipts under Article 15.A.3.a. of this Basic Agreement.

5.    Any dispute concerning Article 16.A.8. which is subject to the expedited arbitration procedure in Article 11.F.

## D.   REFUSAL TO ARBITRATE

A failure or refusal by any party to go to grievance on a matter subject to grievance or to arbitrate an arbitrable matter, including disputes as to jurisdiction and arbitrability pursuant to this Article 10, is a substantial breach of this Basic Agreement.  A failure or refusal by any party to go to grievance on a matter subject to grievance or to arbitrate an arbitrable matter shall not limit, impair or divest the jurisdiction and powers of the grievance committee or arbitrator provided notice of grievance or arbitration has been served as provided herein.  Grievance and arbitration may proceed despite the failure of a party to appear and the grievance committee or arbitrator may enter an award against such a party.

## E.   REFERENCES

All references in Articles 10, 11 and 12 to individual employment agreements, loan-out agreements or purchase agreements only refer to such agreements as are subject to this Basic Agreement.

## ARTICLE 11 - GRIEVANCE AND ARBITRATION RULES AND PROCEDURES

## A.   GENERAL RULES

Unless otherwise provided in this Article 11 or elsewhere in this Basic Agreement, the rules and procedures for grievance and arbitration shall be as follows:

1.   Parties

    a.   In any grievance or arbitration concerning any claim by a writer for compensation under Article 10.A.3., the Guild and the writer involved shall be jointly a party and may be represented by joint counsel.  In any grievance or arbitration concerning such a claim by any loan-out company, the loan-out company also shall be jointly a party and may be represented by joint counsel.  The claim shall be initiated by the Guild on behalf of the writer and the loan-out company, if any.

    b.   Except as provided in subparagraph a. above, only the Company and the Guild shall be parties.

    c.   [Renumbered as Article 11.B.3. and deleted here.]

    d.   The party commencing a claim in grievance or arbitration is sometimes referred to herein as complainant.  The party

---

**ARTICLE 10.D.**
GRIEVANCE AND ARBITRATION
REFUSAL TO ARBITRATE

against whom such grievance or arbitration is commenced is sometimes referred to herein as respondent.  Use of such terms in the singular shall be deemed to include the plural.

e.  The grievance and arbitration provisions shall apply to disputes with respect to purchase agreements with professional writers to the same extent but no greater than they are applicable to disputes involving employed writers.

f.  As used in Articles 10, 11 and 12 of this Basic Agreement, the term "writer" shall be deemed to include the plural, the writer's loan-out company if any (as defined in Article 3 of this Basic Agreement) and, in the case of a purchase agreement, a professional writer (as defined in Article 1 of this Basic Agreement).

2.  Time Limits

a.  Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking a grievance proceeding) of a claim relating to actual or alleged television employment or purchase shall be commenced no later than two (2) years after the party bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based.  Proceedings for grievance (or arbitration, to the extent a party is required to initiate arbitration without invoking a grievance proceeding) of a claim relating to actual or alleged theatrical employment or purchase shall be commenced no later than eighteen (18) months after the party bringing the grievance or arbitration proceeding (whether it is the Company, Guild or the writer) has obtained knowledge of the facts upon which the claim is based.

b.  In any event, grievance and arbitration proceedings shall commence not later than four (4) years after the occurrence of the facts upon which the claim is based.  An arbitration may be commenced prior to initiation or conclusion of a grievance proceeding, if it reasonably appears that the grievance proceeding will not be concluded in sufficient time to permit the arbitration proceeding to be commenced in time.

c.  With respect to separation of rights in literary material written for television or a High Budget SVOD Program as defined in the Sideletter on Literary Material Written for Programs Made for New Media, Company may accelerate the

applicable limitation of time by serving notice on the Guild, after the literary material is completed, that the writer concerned does not have separation of rights in such material and by furnishing with such notice copies of all literary material and contracts upon which the Company's position in such notice is based.  The Guild must respond within ninety (90) days from the date such notice is received or the claim to separation of rights is waived on behalf of the writer and the Guild.

d.      If grievance or arbitration proceedings are not commenced within the applicable time period specified in this Article 11, such claim shall be deemed to be waived.  All time limits provided in Article 11 may be extended by mutual agreement of the parties to the dispute.

e.      It is the intent of the Guild and the Company that all arbitration awards should be rendered within sixty (60) days following the close of the arbitration hearing or submission of post-hearing briefs, whichever is later.  However, the arbitrator's failure to render an award within such period shall not deprive him/her of jurisdiction over the dispute or render the award invalid because it is made thereafter.

3.      Place of Hearing

Except as otherwise provided in this paragraph, all arbitrations shall be in Los Angeles, absent agreement of the parties.  At the election of Writers Guild of America, East, the arbitration shall be in New York if a majority of the witnesses required for the arbitration hearing reside regularly in and around the New York area; provided, however, if any Company which is a party to the arbitration has its headquarters for the production of motion pictures in California, such arbitration shall be held in Los Angeles. Any dispute as to where the arbitration should be held shall be determined by an arbitrator in Los Angeles, selected in accordance with the procedures set forth in Article 11.C.2., and said arbitrator shall be disqualified from hearing the merits of the dispute.  Said arbitrator shall take testimony by telephone from distant witnesses when requested to do so by either party.  If the arbitrator determines that the arbitration shall be heard in New York, the arbitrator assigned to hear the merits of the dispute shall be selected from the New York list of arbitrators set forth in Article 11.C.2.

The selection of the situs of the hearing room within the appropriate city shall be by mutual agreement of the Company and the Guild.  If

---

**ARTICLE 11.A.2.c.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
GENERAL RULES

there is no such agreement, those parties will alternate in selecting the hearing room, with the party making the selection supplying the room at no charge to the other.

4.    Award

The grievance committee and the arbitrator may make any appropriate award permitted herein.  Such award shall be in writing and shall be limited as provided in this Basic Agreement.  Subject to the provisions of this Basic Agreement, the award shall be final and binding upon the parties to the proceeding, whether participating in the proceeding or not, and in any grievance or arbitration proceeding in which the writer involved is not a party. Any interpretation of this Basic Agreement made in such award shall be final and binding on such writer.

5.    Costs

Each party shall pay the costs of its representatives on the grievance committee.  The fee and expenses of the arbitrator shall be shared equally, unless otherwise provided by the arbitrator.  The arbitrator may require a court reporter and a transcript, and if so required, the cost thereof shall be shared equally.  All other costs and expenses of grievance and arbitration shall be borne by the party incurring the same.

6.    Notices

a.    All written notices referred to in this Article 11 commencing a grievance or arbitration or alleging a cross-claim shall be sent by registered or certified mail or by personal delivery and shall set forth the particulars thereof.  If the moving party is unable to effect service in this manner, service then may be effected by first class mail, postage prepaid, to the address for service last designated in writing by the Company, together with publication in *Daily Variety, The Hollywood Reporter, The Los Angeles Times* and *The New York Times*.  All other written notices may be served by first class mail, postage prepaid, unless otherwise specifically provided herein.

b.    All notices sent by the Guild to the Company shall be sent to the address designated by the Company in writing to the Guild at the time Company becomes signatory to the Basic Agreement.  Should Company change its address for the purpose of receiving notices relating to grievance or arbitration, the Company shall notify the Executive Director

of Writers Guild of America, West, Inc. and the Executive Director of Writers Guild of America, East, Inc. of such new address, which shall then be substituted for the prior address.

c. Unless otherwise designated by Company in a written notice to the Guild, all notices sent by the Guild to the Company shall be addressed to the attention of an officer of the Company, or to its Labor Relations Department. If the Company maintains an office in Los Angeles, California or its vicinity, all such notices shall be sent to said office.

d. A petition to confirm, modify or vacate, as the case may be, an arbitration award in any court of competent jurisdiction shall be served upon the respondent by registered or certified mail or by personal delivery. If the petitioner is unable to effect service in this manner, service then may be effected by first class mail, postage prepaid, to the address for service last designated in writing by the Company, together with publication in *Daily Variety, The Hollywood Reporter, The Los Angeles Times* and *The New York Times*.

7. Conduct of Proceedings

Except as set forth elsewhere herein, the grievance committee and the arbitrator shall adopt such rules of procedure and shall conduct proceedings in such manner as they shall determine to be proper; provided, however, that each party to any grievance or arbitration shall be afforded a reasonable opportunity to present evidence and argument before the grievance committee and the arbitrator.

All hearings, deliberations and proceedings of the arbitrator and the grievance committee shall be closed to the public and shall be absolutely privileged. Only interested parties, their representatives and witnesses may attend. All communications to and from the arbitrator or the grievance committee shall likewise be absolutely privileged. Unless the Company objects, the arbitrator will send a copy of the award to the AMPTP. The Guild shall have access to those awards.

8. Claims for Compensation, Cross-Claims and Defenses

Subparagraphs a. through e. of this subparagraph 8. relate to compensation claims, cross-claims and defenses covered by Articles 10.A.3. and 10.A.4. of this Basic Agreement.

a. The grievance committee and arbitrator shall have no jurisdiction to determine or affect any claim relating to services in connection with any theatrical or television motion picture other than the theatrical or television motion picture as to which the compensation claim is asserted unless a defense or cross-claim is asserted with respect to another theatrical or television motion picture.

b. A decision made or award rendered in grievance or arbitration of a claim for compensation shall be limited to deciding or awarding what compensation, if any, is due the writer from the Company and what amount, if any, is due the Company from the writer on account of any cross-claim asserted by the Company in such grievance or arbitration.

c. If a claim for compensation under Article 10.A.3. of this Basic Agreement is submitted to grievance or arbitration, any claim of a breach of this Basic Agreement arising out of or connected with said claim must, to the extent permitted by the Basic Agreement, be submitted for grievance and arbitration together with the claim for compensation, provided that the Guild or the writer has obtained knowledge of the facts upon which said claim of breach is based. Failure to so submit such claim shall constitute a waiver of any and all rights to assert such claim thereafter.

d. The institution of any action in court by the Company shall not stay an arbitration proceeding brought by the Guild and writer for compensation, nor shall any such grievance or arbitration proceeding stay any action instituted by the Company upon any matter Company is not required to submit to grievance or arbitration as a defense or cross-claim, whether or not such action is instituted prior to the submission of the compensation claim to grievance or arbitration.

e. Cross-claims must be submitted to grievance or arbitration by serving written notice on the complainant, by certified or registered mail, setting forth the particulars thereof.

9. Overpayments

If the Company claims that it has made an overpayment to a writer of any compensation provided for in this Basic Agreement or in any prior collective bargaining agreement between the Company and the Guild (*i.e.,* minimum compensation, residuals and other compensation provided for in this Basic Agreement or any other

such collective bargaining agreement (hereinafter called "MBA compensation")) or of any compensation provided for in an employment or loan-out contract with a writer or an option agreement subject to the MBA or a purchase agreement with a professional writer not in excess of the applicable jurisdictional maximum of four hundred thousand dollars ($400,000.00) as set forth in Article 10.A.3. above (hereinafter called "arbitrable overscale compensation"), and if the Company desires to offset such payment against other compensation payable to such writer, the Company shall advise the Guild thereof in writing setting forth the particulars of such claim of overpayment.  If the Guild requests that the question of whether the Company has overpaid MBA compensation or arbitrable overscale compensation to the writer be submitted to grievance and arbitration, such request shall be made within seven (7) days after such notice from the Company to the Guild.  If the Guild does not make a timely request, the Company may proceed with the offset, subject to all of the legal rights and remedies of the writer.  If the Guild does make a timely request, then pending the outcome of such grievance and arbitration, the Company agrees that it will not apply the offset, but will pay the amount it desires to apply as an offset to the Guild.  The Guild shall then promptly deposit the amount so paid in a separate interest-bearing trust account until it is determined in such grievance and arbitration proceeding whether there was in fact an overpayment of MBA compensation or arbitrable overscale compensation, as the case may be.  The grievance and arbitration shall involve only the question of whether there was in fact an overpayment of such compensation, and the amount thereof, and if it is determined that there was in fact an overpayment of such compensation, the right of offset is recognized.  Upon conclusion of the arbitration, the payments into such account, together with applicable interest, shall be paid to the Company or to the writer in accordance with the arbitration decision.  The parties shall cooperate in obtaining a speedy determination of the grievance and arbitration.  As to any claimed right of offset with respect to any alleged overpayments of monies other than MBA compensation or arbitrable overscale compensation, the Guild and the Company reserve their respective rights and contentions.

10.   Withdrawal of Services

Notwithstanding any provision of any personal service contract (including a memorandum agreement) or of the MBA to the contrary, it shall not be a violation thereof for the Guild or any employee (at the direction of the Guild) to withhold services from the Company if the Company fails or refuses to abide by the final award of an arbitrator for any reason whatsoever.

ARTICLE 11.A.9.
GRIEVANCE AND ARBITRATION
GENERAL RULES

**54**

11. Any grievance and/or arbitration concerning a dispute arising under a prior MBA or a writer's individual employment agreement, loan-out agreement, option agreement or purchase agreement subject to a prior MBA shall be subject to the following grievance and arbitration rules and procedures as set forth in the MBA in effect at the time the grievance or arbitration is initiated:

 a. The lists of arbitrators;

 b. The method of selecting an arbitrator;

 c. A party's unilateral right to waive second step grievance;

 d. Use of a sole disinterested arbitrator rather than a tripartite arbitration panel;

 e. Respondent's written statement of position prior to an arbitration hearing;

 f. Methods of effecting service of grievance notices, arbitration claims, cross-claims and notices, and petitions to confirm, modify or vacate an arbitration award;

 g. Arbitration of disputes concerning tri-Guild residuals audits as set forth in the Sideletter to Article 11.H.;

 h. Expedited arbitration of residuals disputes under Article 11.G.; and

 i. Expedited arbitration of reacquisition disputes under Article 11.F.

The parties agree that the provisions of this Article 11.A.11. shall not be construed to render a dispute subject to grievance and/or arbitration hereunder if that dispute was not subject to grievance and/or arbitration under such prior MBA. The parties further agree that to the extent a claim of overpayment as described in Article 11.A.9. of this Agreement or a "cross-claim" may lie, the provisions of this Article 11.A.11. also shall apply.

## B. GRIEVANCE

1. Step One - Informal Conference

Prior to submitting to grievance any matter properly a subject thereof, an authorized representative of the Guild and an

authorized representative of the Company will meet in a good faith attempt to settle the dispute.  If the representatives of the parties shall fail to settle the dispute within fourteen (14) days after the matter is first brought to the attention of the respondent, then the dispute may be referred to Step Two Grievance.

2.    Step Two - Grievance

a.    Commencement of Grievance

Complainant shall set out the nature of its claim in writing, and serve a copy ("grievance notice") thereof upon respondent by certified or registered mail.  Respondent may, but need not, reply in writing, setting forth its position.  The parties shall attempt to agree upon a mutually satisfactory date to convene a grievance committee and hold a grievance hearing, but if no mutually agreeable date is chosen, respondent may, within five (5) days after receipt of the grievance notice, designate by written notice to complainant a date upon which the grievance committee shall convene to hold the grievance hearing.  Such date shall be no earlier than fifteen (15) nor later than thirty (30) days after receipt of the grievance notice.  If respondent fails or refuses to designate such a date, complainant may designate the date for such meeting, such date to be not earlier than fifteen (15) nor later than thirty (30) days after service of the grievance notice.

b.    Grievance Committee

The grievance committee shall consist of three (3) representatives chosen by respondent and three (3) representatives chosen by complainant.  Either party shall have the right to designate a substitute for any of its representatives.  The committee will, by majority vote, select its chairman.  By mutual agreement, the grievance committee may consist of two (2) representatives chosen by respondent and two (2) representatives chosen by complainant.

c.    Grievance Hearing

The grievance committee thus designated shall meet upon the date selected pursuant to the procedure described above, and shall consider and attempt to resolve the dispute brought before it.  The hearing shall be conducted in an orderly fashion, but rules of evidence and technicalities of

ARTICLE 11.B.1.
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
GRIEVANCE

procedure shall not be controlling.  It is the intent of this Basic Agreement that the committee members shall use their good faith, best judgment and common sense, as persons experienced in the motion picture and television industry, in attempting to resolve the dispute brought before it.  No matter shall be considered by the grievance committee unless a quorum is present.  A quorum shall consist of six (6) members.  If any four (4) members of the committee shall agree on a decision, such decision shall be final and binding upon the parties to the proceedings and any interpretation of this Basic Agreement made in such decision shall also be binding upon the writer or writers involved.  If no decision is agreed upon, then in any subsequent arbitration or other proceeding, no reference shall be made to the grievance proceeding or to any statements or discussions therein, or to the failure of the grievance committee to settle the dispute.

d.     Unresolved Grievance

If either party fails to designate its representatives within ten (10) days after notice of grievance is served, or if the committee shall fail to meet and commence hearings on the date selected in accordance with the procedures described above, or if four (4) members of the committee shall fail to concur in a decision, or if a grievance hearing is waived by one (1) of the parties hereto, or in any event if the dispute has not been settled by the committee or otherwise within forty-five (45) days after the mailing of the grievance notice, then either party may submit such matter to arbitration.

3.     Waiver of Grievance [appeared as Article 11.A.1.c. in predecessor Agreements].

Either party may, by written notice to the other party, waive grievance.  In such event, the dispute shall be submitted directly to arbitration.

## C.     ARBITRATION

1.     Initiation of Proceedings

A dispute which is subject to grievance proceedings shall not be subject to arbitration, except as provided in subparagraph B.2.d. or subparagraph B.3. of this Article 11.  An arbitration shall be initiated by complainant by written notice, setting forth the particulars of the claim, to be sent to respondent in accord with the procedures

described in Article 11.A.6.a. of this Basic Agreement.  Respondent will provide complainant with a written statement of its position not later than ten (10) days prior to the date of the hearing.

2.    Selection of Arbitrator

The arbitrator shall be a disinterested person.  The parties shall in good faith attempt to mutually agree upon an arbitrator within ten (10) business days after respondent's receipt of the arbitration notice.  The complainant may extend this ten (10) day period upon written notice to respondent(s) at the time the arbitration claim is served.  Such extension is deemed effective at that time absent an objection by respondent(s).  In addition, the extension will no longer be deemed effective if respondent(s) gives subsequent written notice to complainant in which case the parties shall in good faith attempt to mutually agree upon an arbitrator within ten (10) business days after complainant's receipt of notice from respondent(s).  With respect to arbitration claims served on or after May 2, 2011, if the complainant has failed to take any action to select the arbitrator (either by mutual agreement or the applicable Strike Process), or has failed to withdraw the claim with or without prejudice, for a period of eighteen (18) months after service of the claim on respondent(s), such claim shall be deemed to be waived.

Should the parties fail to agree on an arbitrator, the arbitrator shall be selected by the "Strike Process" as follows:

a.    The arbitrators listed in Article 11.C.2.e.(3) shall constitute the lists of arbitrators.

b.    On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the applicable list of arbitrators (Los Angeles or New York).  Thereafter, the other party shall "strike" a name from the list.  The parties shall continue to alternate in striking names from the list, until one (1) arbitrator's name remains.

c.    The arbitrator whose name remains (after the Strike Process is completed) shall be the arbitrator.

d.    The "Strike Process" shall commence within two (2) business days following completion of the ten (10) business day period referred to in subparagraph 2. above and must conclude no later than three (3) business days following completion of the ten (10) day period referred to in subparagraph 2. above.

e.     In the event that one of the parties fails to participate in the Strike Process, or fails to strike in order and/or timely, the other party may thereupon select the arbitrator to hear the matter.

(1)    [Deleted.]

(2)    If more than one Company is a party, then the Company which is the real party in interest shall participate in the striking process with the Guild.  In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the striking process with the Guild.

(3)    The authorized lists of arbitrators approved by the parties hereto are as follows:

### LOS ANGELES

| | |
|---|---|
| Sara Adler | Joel Grossman |
| Norman Brand | Fredric R. Horowitz |
| Mark Burstein | Najeeb Khoury |
| Douglas Collins | Fred Kuperberg |
| Paul E. Crost | Kenneth Perea |
| Greg David Derin | Sol Rosenthal |
| Dixon Dern | Robert Steinberg |
| Edna Francis | Gail Migdal Title |
| William Gould IV | |

### NEW YORK

| | |
|---|---|
| Noel Berman | Susan MacKenzie |
| Daniel Brent | Joan Parker |
| Howard Edelman | Janet Spencer |
| Melinda G. Gordon | Carol Wittenberg |
| Joshua Javits | |

Additional names may be added from time to time during the term of the contract by mutual agreement

**ARTICLE 11.C.2.e.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
ARBITRATION

**59**

of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

3. Substitution of Arbitrators

If the arbitrator selected cannot serve, a substitute shall be selected in accordance with subparagraph 2. above.

4. Notice of Hearing

The arbitrator or, at his/her request, one of the parties shall give written notice to the parties of the time and place of the arbitration hearing. In fixing such date, the arbitrator shall consult the parties and shall consider the time reasonably necessary for the parties to prepare their cases.

5. Exchange of Information

The parties will cooperate in the exchange of information prior to the hearing regarding the expected utilization of documents and witnesses, including the exchange of lists of witnesses and copies of documents to be utilized. Such utilization shall not be precluded because such exchange did not take place.

6. Hearing

a. The arbitrator may, upon a showing of good cause, continue the hearing.

b. The arbitration shall take place as noticed or continued regardless of whether one (1) or more of the parties fails to participate.

## D. ARBITRATION OF DISPUTES WHICH INVOLVE QUESTIONS OF JURISDICTION OR ARBITRABILITY

An objection to jurisdiction or arbitrability shall first be determined by the arbitrator prior to proceeding with a hearing on the merits. If the arbitrator determines that there is jurisdiction and that the dispute is arbitrable, the arbitrator shall proceed to a decision on the merits; provided, however, that the party contesting arbitration or jurisdiction shall not, by proceeding to a determination of the merits of such arbitration, be deemed to have waived its position that the dispute is not arbitrable or that the arbitrator does not have jurisdiction. If the arbitrator rules he has no jurisdiction over the dispute or that the dispute is not arbitrable, then each party is relieved of its obligation to further delay taking any action at law or in equity which it may desire to take.

**ARTICLE 11.C.2.e.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
ARBITRATION

### E.   ARBITRATION OF DISPUTES CONCERNING CREDIT PROVISIONS

A dispute concerning the credit provisions of this Basic Agreement shall be submitted to an expedited arbitration proceeding governed by the following rules:

1.   The Guild shall act on behalf of itself and the writer.

2.   Within twenty-four (24) hours after the Guild or the Company serves written notice upon the other concerning a dispute involving a credit provision, an authorized representative of the Guild and an authorized representative of the Company will make a good faith attempt to settle or resolve the dispute.

3.   In the event the parties shall fail to meet or shall otherwise fail to settle or resolve the dispute within twenty-four (24) hours after the twenty-four (24) hours provided in subparagraph 2. above, the dispute shall be submitted to arbitration to be commenced not later than five (5) business days after the service of the written notice provided for in subparagraph 2. above.

4.   The dispute shall be submitted to a sole neutral arbitrator mutually selected from the authorized list of arbitrators approved by the parties hereto as follows:

### LOS ANGELES

| | |
|---|---|
| Sara Adler | Joel Grossman |
| Norman Brand | Fredric R. Horowitz |
| Mark Burstein | Najeeb Khoury |
| Douglas Collins | Fred Kuperberg |
| Paul E. Crost | Kenneth Perea |
| Greg David Derin | Sol Rosenthal |
| Dixon Dern | Robert Steinberg |
| Edna Francis | Gail Migdal Title |
| William Gould IV | |

**ARTICLE 11.E.4.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
ARBITRATION OF DISPUTES
CONCERNING CREDITS PROVISIONS

**61**

## NEW YORK

| | |
|---|---|
| Noel Berman | Susan MacKenzie |
| Daniel Brent | Joan Parker |
| Howard Edelman | Janet Spencer |
| Melinda G. Gordon | Carol Wittenberg |
| Joshua Javits | |

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

In the event the parties are unable, within forty-eight (48) hours (not including weekends or holidays) after respondent's receipt of the written notice provided for in subparagraph 2. above, to agree upon an arbitrator from the above list or otherwise, the arbitrator shall be selected by use of the following "strike process:"

a.    The arbitrators listed in this Article 11.E.4. shall constitute the lists of arbitrators.

b.    On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the applicable list of arbitrators (Los Angeles or New York).  Thereafter, the other party shall "strike" a name from the list.  The parties shall continue to alternate in striking names from the list until one arbitrator's name remains.

c.    The arbitrator whose name remains (after the strike process is completed) shall be the arbitrator, so long as the arbitrator is a disinterested person.

d.    The "strike process" shall commence within twenty-four (24) hours (not including weekends or holidays) after the period for mutual agreement has expired and shall be completed within forty-eight (48) hours (not including weekends or holidays) after the period for mutual agreement has expired.

e.    If one of the parties fails to participate in the strike process, or fails to strike in order and/or timely, the other party may thereupon select a neutral arbitrator to hear the matter.

---

**ARTICLE 11.E.4.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
ARBITRATION OF DISPUTES
CONCERNING CREDIT PROVISIONS

f.    If more than one Company is a party, then the Company which is the real party in interest shall participate in the strike process with the Guild.  In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the strike process with the Guild.

5.    Notwithstanding anything in this Basic Agreement to the contrary, the arbitrator shall have jurisdiction and power to award damages, to order the Company to withdraw, cancel, change, or re-do advertising materials already issued or prepared, to require the Company to re-do any film titles, and to order any other reasonable relief the arbitrator deems appropriate in the circumstances, whether relating to credit on the screen, advertising or otherwise. Any award rendered by the arbitrator shall be binding on the parties and upon the writer.

6.    Any or all time limits set forth herein may be waived by the mutual consent of the parties.

7.    To the extent not inconsistent herewith, all other provisions of the Basic Agreement relating to arbitrations shall be applicable.

## F.    EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING REACQUISITION OF UNPRODUCED LITERARY MATERIAL (THEATRICAL)

1.    a.    **Disputes Subject to Expedited Arbitration Procedure**

The following procedure applies only to arbitrable disputes between the Guild and the Company concerning the interpretation or application, or alleged breach, of any provision of Article 16.A.8. of this Basic Agreement or any predecessor WGA Basic Agreement as to which the initial written notice of the writer's desire or intent to reacquire is received by the Company on or after May 2, 1998.

b.    **Parties**

Only the Guild and the Company shall be parties to an Article 11.F. arbitration proceeding.  The Guild shall act on behalf of itself and the writer.

ARTICLE 11.F.1.
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING
REACQUISITION OF UNPRODUCED LITERARY MATERIAL
(THEATRICAL)

**63**

**2.      Right to Invoke**

Either the Guild or the Company shall have the right to invoke this expedited arbitration procedure when there is a likelihood of irreparable harm in connection with the proposed reacquisition if regular arbitration procedures were used.  For purposes of Article 11.F., it is agreed that "irreparable harm" means an event or occurrence that cannot be undone or an opportunity or situation that, once lost or foregone, is unlikely to be revived or recaptured. The burden of proof shall be on the moving party to show that use of the expedited procedure is appropriate under the provisions of this subparagraph 2.

**3.      Commencement of Proceedings**

Complainant shall initiate expedited arbitration proceedings by written notice, setting forth the particulars of the claim, to be sent to the respondent in accordance with the procedures described in Article 11.A.6.a. of the Basic Agreement.  Such notice shall be served within ten (10) business days after the moving party has obtained knowledge of the facts upon which the claim is based.  If expedited arbitration proceedings are not commenced within this time period, use of the expedited procedure shall be deemed waived.  When the WGA or the Company has initiated the Article 48.E. Hot Line procedure, the period of no more than seven (7) days used to attempt resolution of the dispute in this manner shall not be included in the computation of the ten (10) business day period under this subparagraph 3.

**4.      a.      Response or Objection to Expedited Claim**

The respondent shall respond to the claim or object to use of the expedited procedure within ten (10) business days after its receipt of the expedited arbitration claim.  If there is no objection to the procedure, the respondent will provide to complainant a written statement of its position within the time specified in the preceding sentence and, upon selection, to the arbitrator.

**b.      Objection to Expedited Procedure and Interim Ruling**

If the respondent has objected to use of the expedited procedure, the objection must describe the factual or other basis for its contention that use of the expedited procedure is not appropriate under the provisions of Article 11.F.2.  The

ARTICLE 11.F.2.
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING
REACQUISITION OF UNPRODUCED LITERARY MATERIAL
(THEATRICAL)

arbitrator (upon selection) may either convene an informal hearing by conference call, or a formal hearing, for the purpose of determining whether use of the expedited procedure is appropriate.

The hearing will take place within three (3) business days following selection of the arbitrator.  Each party may file hearing briefs, page limit to be set by the arbitrator, and may make closing arguments. There will be no post-hearing briefs.  The arbitrator must inform the parties of his/her decision as to whether the expedited procedure was appropriately invoked within twenty-four (24) hours after conclusion of the hearing, to be followed by an interim ruling in writing.

**5.     Selection of an Arbitrator; Place of Hearing**

**a.**     The arbitrator shall be a neutral third party.  The parties shall in good faith attempt to mutually agree upon an arbitrator within three (3) business days after the response, objection or failure to respond, but in no event later than expiration of the ten (10) business day period in Article 11.F.4.a. above. Should the parties fail to so agree, the arbitrator shall be selected by the "Strike Process" as follows:

(1)     The arbitrators listed in subparagraph (7) below shall constitute the lists of arbitrators.

(2)     On a respondent-by-respondent basis, the moving party and the respondent shall alternate on a case-by-case basis in first striking a name from the list of arbitrators.  Thereafter, the other party shall "strike" a name from the list.  The parties shall continue to alternate in striking names from the list, until one (1) arbitrator's name remains.

(3)     The arbitrator whose name remains (after the Strike Process is completed) shall be the arbitrator.

(4)     The Strike Process shall commence on the first business day following completion of the three (3) business day period referred to in subparagraph 5.a. above and must conclude by close of business that day.

**ARTICLE 11.F.5.a.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING
REACQUISITION OF UNPRODUCED LITERARY MATERIAL
(THEATRICAL)

**65**

(5) In the event that one of the parties fails to participate in the Strike Process, or fails to strike in order and/or timely, the other party may thereupon select the arbitrator to hear the matter.

(6) If there is more than one respondent, then the respondent which is the real party in interest shall participate in the strike process with the Guild.  In the event that such respondents cannot agree on which of them is the real party in interest, then such respondents shall determine by lot which of them shall participate in the striking process with the Guild.

(7) The authorized lists of arbitrators are as follows:

### LOS ANGELES

| | |
|---|---|
| Sara Adler | Joel Grossman |
| Norman Brand | Fredric R. Horowitz |
| Mark Burstein | Najeeb Khoury |
| Douglas Collins | Fred Kuperberg |
| Paul E. Crost | Kenneth Perea |
| Greg David Derin | Sol Rosenthal |
| Dixon Dern | Robert Steinberg |
| Edna Francis | Gail Migdal Title |
| William Gould IV | |

### NEW YORK

| | |
|---|---|
| Noel Berman | Susan MacKenzie |
| Daniel Brent | Joan Parker |
| Howard Edelman | Janet Spencer |
| Melinda G. Gordon | Carol Wittenberg |
| Joshua Javits | |

Additional names may be added from time to time by mutual agreement of the parties, provided that each

---

**ARTICLE 11.F.5.a.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING
REACQUISITION OF UNPRODUCED LITERARY MATERIAL
(THEATRICAL)

panel shall consist of an odd number of arbitrators at all times.

**b.   Substitution of Arbitrators**

If the arbitrator selected cannot serve, a substitute shall be selected in accordance with subparagraph 5.a. above.

**c.   Choice of Two Arbitrators**

If there is to be a hearing on the respondent's objection to use of the expedited procedure, the parties have the option of selecting one arbitrator to rule on such objection and another arbitrator to determine the remaining issues in the case, both of whom shall be selected pursuant to this subparagraph 5.

**d.   Place of Hearing**

The place of the arbitration hearing shall be determined in accord with Article 11.A.3. of the Agreement.

**6.   Timeline; Citation of Expedited Arbitration Awards**

**a.**   The hearing on the merits of the claim shall commence within twenty (20) business days following the respondent's receipt of the arbitration claim or, if the respondent has objected to use of this expedited procedure, within twenty (20) business days following the arbitrator's determination that use of this expedited procedure is appropriate.

The arbitrator or, at his/her request, one of the parties, shall give written notice to the other party of the time and place at which the arbitration hearing will commence.  In fixing such date, the arbitrator shall consult the parties and shall consider the time reasonably necessary for the parties to prepare their cases.  The arbitration shall take place as notified (or as continued) regardless of whether one (1) of the parties fails to participate.

**b.**   The hearing on the merits of the claim shall conclude within ten (10) business days after its commencement, provided that the duration of the hearing is consistent with fundamental fairness in the arbitrator's sole judgment.

**ARTICLE 11.F.6.b.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING
REACQUISITION OF UNPRODUCED LITERARY MATERIAL
(THEATRICAL)

**67**

    **c.**    The parties may file post-hearing briefs within fifteen (15) business days following the close of the hearing. Either party's election to file a post-hearing brief will not preclude that party's right to make a closing argument so long as the hearing concludes within the time permitted in subparagraph 6.b. above.

    **d.**    Within ten (10) business days following either receipt of the parties' briefs, or the conclusion of the hearing if no briefs are filed, the arbitrator shall issue a written decision and award on the issues presented. The arbitrator's failure to meet the deadline shall not oust the arbitrator of jurisdiction. The arbitrator's determination of issues and award shall be final and binding upon the Company, the Guild and the writer or writers involved, whether participating in the proceeding or not.

        Any award so rendered may be cited or offered into evidence by any party in another arbitration proceeding under this Basic Agreement, whether expedited or not.

**7.** **Waiver of Time Limits**

Any or all of the time limits set forth in Article 11.F.6. may be waived by the mutual consent of the parties.

**8.** **Right to Seek an Extension of Time Limit**

Upon the arbitrator's finding of good cause demonstrated by either party, the arbitrator may expand the time for conducting the hearing for a maximum of three (3) additional business days, and/or the time for filing post-hearing briefs for a maximum of three (3) additional business days. In making such a determination, the arbitrator shall take into account the position of a party opposing the extension that prejudice would result from the extension. The arbitrator shall advise the parties of his/her ruling on any request for an extension within forty-eight (48) hours after the request is made.

**9.** **Choice of Arbitration Forum; Application of Other Arbitration Provisions**

Claims processed under this Article 11.F., which result in expedited arbitration awards on the merits of the issues presented, shall not be subject to adjudication in a judicial forum. The preceding

---

ARTICLE 11.F.6.c.
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
EXPEDITED ARBITRATION OF CERTAIN DISPUTES CONCERNING
REACQUISITION OF UNPRODUCED LITERARY MATERIAL
(THEATRICAL)

sentence does not reduce or impair the rights of any party under Article 12.C., D., and E. of this Agreement.

In addition, once an expedited arbitration procedure is initiated, the provisions of Article 11.F. shall preclude arbitration under Article 16.A.6. to the extent that the issue(s) under Article 16.A.6. has (have) been decided in the expedited proceeding.

To the extent not inconsistent herewith, all other provisions of Articles 10, 11 and 12 of the Basic Agreement relating to arbitration shall be applicable.

### 10.   Remedies in the Arbitration Forum

In an expedited arbitration proceeding under Article 11.F., the arbitrator is limited to providing remedies that are in the nature of equitable relief such as a declaration of the respective rights of the parties and specific performance.

If all issues in dispute concerning the reacquisition are not fully resolved in the expedited proceeding, the WGA or the Company may initiate a subsequent arbitration proceeding under the regular procedures in the Basic Agreement.

### 11.   Legal Subcommittee

The parties to this Basic Agreement shall establish a legal subcommittee to explore whether the expedited arbitration procedure in Article 11.F. should apply to other Article 16 disputes. The subcommittee shall report its recommendations, if any, to the Contract Adjustment Committee (CAC).

### G.   ARBITRATION OF CERTAIN DISPUTES CONCERNING RESIDUALS PROVISIONS

Notwithstanding any other provision of the MBA, a dispute concerning the residuals provisions of this Basic Agreement or a predecessor WGA Basic Agreement shall be submitted to an expedited arbitration proceeding if the respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C., above.  This expedited proceeding will be governed by the following rules:

ARTICLE 11.G.
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
ARBITRATION OF CERTAIN DISPUTES
CONCERNING RESIDUALS PROVISIONS

69

1. **Invocation of Expedited Proceeding**

   A Notice of Expedited Arbitration (so labeled by the claimant) shall be reduced to writing and delivered to the respondent.  The Notice of Expedited Arbitration shall include the name, address and telephone number of the claimant's representatives and the name of the person who represents the respondent, if known.  The Notice of Expedited Arbitration shall also set forth the particulars of the claim, including an allegation that the respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C.

   This expedited procedure is not available when the residuals obligation(s) at issue is (are) payable, guaranteed or assumed by a "Qualified Distributor," "Qualified Buyer" and/or a "Qualified Residuals Payor," except by mutual agreement.

2. **Attempt to Settle Dispute**

   Within seven (7) business days after the claimant serves written notice upon the respondent concerning an expedited arbitration proceeding, an authorized representative of the claimant and an authorized representative of the respondent will make a good faith attempt to settle or resolve the dispute.

3. **Submission of Dispute to Arbitrator**

   In the event the parties shall fail to meet or discuss the claim, or shall otherwise fail to settle or resolve the dispute within fifteen (15) business days after the respondent's receipt of the claim, the dispute shall be submitted to arbitration to be commenced not later than sixty (60) days after the respondent's receipt of the claim.

4. **Place of Hearing**

   All expedited arbitration hearings under this Paragraph G. shall be in Los Angeles, absent agreement of the parties to another situs.

5. **Arbitrator Selection**

   The dispute shall be submitted to a sole neutral arbitrator mutually selected from the authorized list of arbitrators as follows:

---

## LOS ANGELES

| | |
|---|---|
| Sara Adler | Joel Grossman |
| Norman Brand | Fredric R. Horowitz |
| Mark Burstein | Najeeb Khoury |
| Douglas Collins | Fred Kuperberg |
| Paul E. Crost | Kenneth Perea |
| Greg David Derin | Sol Rosenthal |
| Dixon Dern | Robert Steinberg |
| Edna Francis | Gail Migdal Title |
| William Gould IV | |

Additional names may be added from time to time during the term of the contract by mutual agreement of the parties, provided that each panel shall consist of an odd number of arbitrators at all times.

In the event the parties are unable, within ten (10) business days (not including weekends or holidays) after the respondent's receipt of the claim, to agree upon an arbitrator from the above list or otherwise, the arbitrator shall be selected by use of the following "strike process:"

a.    The arbitrators listed in this Article 11.G. shall constitute the list of arbitrators.

b.    On a Company-by-Company basis, the Guild and the Company shall alternate on a case-by-case basis in first striking a name from the list of arbitrators.  Thereafter, the other party shall "strike" a name from the list.  The parties shall continue to alternate in striking names from the list until one arbitrator's name remains.

c.    The arbitrator whose name remains (after the strike process is completed) shall be the arbitrator, so long as the arbitrator is a disinterested person.

d.    The strike process shall commence within twenty-four (24) hours (not including weekends or holidays) after the period for mutual agreement has expired and shall be completed within forty-eight (48) hours (not including weekends or holidays) after the period for mutual agreement has expired.

**ARTICLE 11.G.5.d.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
ARBITRATION OF CERTAIN DISPUTES
CONCERNING RESIDUALS PROVISIONS

**71**

e.      If one of the parties fails to participate in the strike process, or fails to strike in order and/or timely, the other party may thereupon select a neutral arbitrator to hear the matter.

f.      If more than one Company is a party, then the Company which is the real party in interest shall participate in the strike process with the Guild.  In the event that such Companies cannot agree on which of them is the real party in interest, then such Companies shall determine by lot which Company shall participate in the strike process with the Guild.

6.      **Award**

The arbitrator's written award shall be issued within sixty (60) calendar days from the end of the expedited arbitration hearing if closing argument is substituted for post-hearing briefs, or ninety (90) days following submission of post-hearing briefs.  The arbitrator's failure to meet the deadline shall not oust the arbitrator of jurisdiction.  The arbitrator's determination of issues and award shall be final and binding on all parties, whether participating in the hearing or not.  The parties shall be so bound in any subsequent arbitration proceeding between them concerning a residuals dispute involving the same theatrical and/or television motion picture(s).  Except as provided above, awards resulting from the use of these expedited procedures shall not be offered in evidence or cited in arbitrations under this Basic Agreement.

7.      **Continuance of Hearing and Testimony by Telephone**

The hearing shall not be continued, absent agreement of the parties, except upon proof of good cause by the party requesting such continuance.  The unavailability of any witness shall not constitute good cause unless the witness' testimony is relevant to the issues in the arbitration and could not be received by means consistent with fundamental fairness which do not require the witness' presence at the hearing.  Each party shall have the right to present the testimony of any witness by telephone, so long as the arbitrator is satisfied that the examination is consistent with fundamental fairness.

8.      **Settlement**

Nothing contained in this Article 11.G. shall preclude the parties from discussing the settlement of the dispute, except that such discussion shall not delay the expedited arbitration procedure.

---

**ARTICLE 11.G.5.e.**
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
ARBITRATION OF CERTAIN DISPUTES
CONCERNING RESIDUALS PROVISIONS

9.    **Time Limit for Use of Expedited Proceedings and Determination of Claims Not Subject to Expedited Arbitration**

The failure of the claimant to serve the Notice of Expedited Arbitration within sixty (60) days following the date on which the facts upon which the claim is based were discovered by the moving party shall constitute a waiver of the right to use this expedited arbitration procedure.  If two (2) or more residuals claims are submitted to expedited arbitration and the expedited arbitration procedure has been waived or is inapplicable to one (1) or more claims, absent objection by the respondent, the non-expedited claim(s) may be heard in the expedited proceeding.  If the respondent objects to the determination of the non-expedited claim(s) in the expedited proceeding, the same arbitrator selected to hear the expedited claim(s) may, absent objection by a party during the arbitration hearing, determine the claim(s) not subject to expedited arbitration, provided that such non-expedited arbitration claim(s) shall be determined in a separate proceeding conducted in accordance with Article 11.C., above.

10.    **Right to Object to Expedited Procedures and Interim Ruling**

The respondent may object to proceeding under this Article 11.G. by serving written notice of such objection with claimant and the arbitrator within seven (7) business days of receipt of the Notice of Expedited Arbitration.  The respondent's notice of objection must describe facts indicating it is financially responsible, or that it is not likely that its assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be able to satisfy its residuals liability if the dispute(s) at issue were processed through the grievance and/or arbitration procedures set forth in Articles 11.A. through 11.C., above.  In the event of an objection, the claimant shall have the burden of proving that it is consistent with this Article 11.G. to hear the dispute(s) under these expedited procedures.

The arbitrator may convene an informal hearing by telephone conference call, or a formal hearing, to determine whether it is consistent with this Article 11.G. to hear the dispute(s) under these expedited procedures.  If the arbitrator convenes a hearing, that hearing will take place within three (3) business days of receipt of the respondent's notice of objection.  The parties may file hearing briefs, the page limit to be set by the arbitrator, and they may make closing argument.  There will be no post-hearing briefs.  The arbitrator must inform the parties of the interim ruling on the use of the expedited procedures under this Article 11.G. within twenty-four

ARTICLE 11.G.10.
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
ARBITRATION OF CERTAIN DISPUTES
CONCERNING RESIDUALS PROVISIONS

73

(24) hours after conclusion of the hearing or, in the event no hearing is convened, within twenty-four (24) hours of the submission to the arbitrator of all briefs and/or relevant documents, to be followed by an interim ruling in writing.

11.    **Bifurcation**

If the expedited arbitration involves multiple residuals disputes or controversies, such as which of two (2) or more respondents is liable to make payment and the amount of residuals unpaid, the arbitrator may, upon the request of a party, bifurcate or separate such disputes or controversies and render separate awards, each of which shall be deemed final.

12.    **Invocation of Expedited Proceeding After Service of Claim Under Articles 11.A. through 11.C.**

If, after such time as a residuals arbitration has been commenced under the procedures set forth in Articles 11.A. through 11.C. above, a party learns that a respondent is not financially responsible, or it is likely that the respondent's assets will be depleted or transferred, such that in either case it is reasonable to believe that the respondent would be unable to satisfy its residuals liability if the dispute were processed through such grievance and/or arbitration procedures, any party to that arbitration proceeding may invoke an expedited arbitration under this Article 11.G. by serving appropriate notice to that effect.

13.    **Waiver of Time Limits**

Any and all time limits in Article 11.G. may be waived by the mutual consent of the parties.

14.    **Other Provisions Applicable**

To the extent not inconsistent with Article 11.G., all other provisions of the Basic Agreement relating to arbitrations shall be applicable.

H.    **ARBITRATION OF DISPUTES CONCERNING TRI-GUILD RESIDUALS AUDITS**

See Sideletter to Article 11.H., Arbitration of Disputes Concerning Tri-Guild Residuals Audits, for the procedures applicable to such cases.

---

ARTICLE 11.G.10.
GRIEVANCE AND ARBITRATION RULES AND PROCEDURES
ARBITRATION OF CERTAIN DISPUTES
CONCERNING RESIDUALS PROVISIONS

### I.   EQUAL STATUS OF PARTIES

It is understood that the Companies and the Guild are parties of equal status under this Agreement and in the administration of the arbitration processes throughout this Agreement.  The equal status of the parties in the administration of the arbitration process shall be recognized in matters involving the determination of the availability of arbitrators, the selection of hearing dates, the retention of stenographic reporters, and insofar as applicable in all communications with the arbitrators.

Arbitration claims, cross-claims and notices shall carry the caption "WRITERS GUILD OF AMERICA - PRODUCERS ARBITRATION TRIBUNAL."

## ARTICLE 12 - COURT PROCEEDINGS

### A.   DISPUTES CONCERNING CREDITS

Nothing in this Basic Agreement shall limit the rights of the Guild or any writer to assert any and all appropriate legal and equitable rights and remedies to which the Guild or such writer is entitled in courts of competent jurisdiction with regard to an alleged breach of Article 8 and Schedule A of this Basic Agreement with respect to writing credit; subject, however, to the following conditions and limitations:

1.   The Guild and the writer shall be bound by any court proceedings instituted by the Guild.

2.   If the Guild or the writer commences any proceedings in court with respect to any such alleged breach prior to the submission of the dispute to arbitration hereunder, then neither the Guild nor the writer may submit such dispute to arbitration and no arbitrator shall have jurisdiction to consider the alleged breach of such credit provision.

3.   If the Guild or the Company commences an arbitration proceeding hereunder with respect to any such alleged breach prior to the submission of the dispute to a court, then neither the Guild nor the writer shall thereafter commence any proceeding in court with respect to such alleged breach.

4.   Any permissible court proceeding referred to in this Paragraph A. must be commenced by the Guild or the writer, if at all, within the applicable time limits specified in subparagraph 2. of Article 11.A.

Attachment 8(c)

| | |
|---|---|
| In the Matter of Arbitration ) <br> ) <br> between ) <br> ) <br> WRITERS GUILD OF AMERICA, WEST, INC., ) <br> and SARAH SMITH, ) <br> ) <br> Complainant, ) <br> ) <br> and ) <br> ) <br> CLUB Q PICTURES, LLC, JEFF KALLIGHERI, ) <br> and DENIS O'SULLIVAN, ) <br> ) <br> Respondents ) <br> ) <br> ("The Sweet Sickness") ) | **ARBITRATOR'S** <br><br> **OPINION** <br><br> **AND** <br><br> **AWARD** <br><br><br><br> WGA Case No. 22-CO-0200 |

Impartial Arbitrator:        Fredric R. Horowitz, Esq.

Appearances:

    Complainants:        Alejandro Delgado, Esq.
                          Writers Guild of America, West, Inc.

    Respondents:        Michael Maizner, Esq.
                          Maizner & Associates, PLLC

                          Michael J. Weiss, Esq.
                          Concentric Law, PC

    Hearings Held:        August 7, 8 and September 5, 2025
                          (Via Zoom Video Conference)

    Submitted to Arbitrator:        January 30, 2026

This arbitration arises under the 2020 Writers Guild of America Theatrical and Television Minimum Basic Agreement ("MBA") [JX 1] between Complainant Writers Guild of America, West, Inc. ("WGAW" or "Guild") and Respondents Club Q Pictures, LLC ("Company"), Jeff Kalligheri ("Kalligheri"), and Denis O'Sullivan ("O'Sullivan") concerning alleged unpaid compensation in connection with the theatrical motion picture project "The Sweet Sickness" ("Project") before the undersigned serving as sole, neutral arbitrator pursuant to the provisions of the MBA.

## MATTERS AT ISSUE

The parties have proffered separate statements of the issues to be decided by the Arbitrator in this proceeding but stipulated the Arbitrator has the authority to frame the issues after the matter is submitted to the Arbitrator for decision [JX 3; TR 18-19; 378-9].

WGAW proposed the following statement of issues:

1. Whether Respondents violated the MBA by failing to pay Ms. Smith the MBA minimum compensation due for the three high budget theatrical motion picture treatments Ms. Smith prepared and delivered to the Company on May 6, June 24, and July 1, 2022 in connection with the Project? If so, what is the appropriate remedy?

2. Whether Respondents breached the terms of the writing services agreement entered into between Ms. Smith and the Company, and violated the MBA, by failing to pay Ms. Smith guaranteed overscale compensation in the amount of $125,000 for a rewrite of a theatrical motion picture screenplay and $85,000 for another rewrite? If so, what is the appropriate remedy?

3. Whether Respondents owe pension plan, health fund, and paid parental leave contributions and pursuant to MBA Article 17 in connection with each of the three high-budget theatrical motion picture treatments, and two rewrites? If so, what is the appropriate remedy?

4. Whether interest is due at the MBA rate of 1.5% per month, as set forth in MBA Article 13.A.14, in connection with the balance of initial compensation due for the 3 treatments and rewrites? If so, what is the appropriate remedy?

5. Whether interest is due at the rate of .83% per month pursuant to Article 17A of the MBA and the Trust Agreements incorporated thereto on the

unpaid pension plan and health fund contributions associated with the 3 treatments and rewrites? If so, what is the appropriate remedy?

Respondents proffered the following statement of issues:

1. Whether Claimant's unilateral decision, as intended writer and director, to prepare outlines without an express contractual obligation, or request from Respondents, to do so nevertheless requires Respondents to pay Claimant the MBA minimum compensation due for theatrical motion picture treatments? If so, what is the appropriate remedy?

2. Whether deal terms exchanged in an email whereby Claimant would be paid overscale compensation in the amount of $125,000 for a rewrite of a theatrical motion picture screenplay and $85,000 for another rewrite that has not been reduced to a written signed instrument constitutes a binding contract for writing services between Respondents and Claimant? If so, was performance of such contract excused under California law?

3. If performance of the alleged writing service was not excused, was the alleged writing services agreement superseded by the signed Certificate of Authorship ("COA") executed by Claimant rendering it unenforceable? If not, what are the remedies?

4. Whether Respondents' failure to tender the payment set forth in the COA is excusable and/or the result of Claimant's anticipatory or actual breach of such COA? If not, what are the remedies?

5. Whether Respondents owe pension plan, health fund, and paid parental leave contributions and pursuant to MBA Article 17 in connection with each of the three high-budget theatrical motion picture treatments, and two rewrites? If so, what is the appropriate remedy?

6. Whether interest is due at the MBA rate of 1.5% per month, as set forth in MBA Article 13.A.14, in connection with the balance of initial compensation due for the 3 treatments and rewrites? If so, what is the appropriate remedy?

7. Whether interest is due at the rate of .83% per month pursuant to Article 17A of the MBA and the Trust Agreements incorporated thereto on the unpaid pension plan and health fund contributions associated with the 3 treatments and rewrites? If so, what is the appropriate remedy?

Based upon a review of the entire record submitted, the following are determined to be the issues to be decided in this proceeding:

1. Whether Respondents breached the terms of an agreement between themselves and Smith by failing to pay overscale compensation in the

amount of $125,000 for a rewrite of a theatrical motion picture screenplay and $85,000 for another rewrite?

2.    Whether Respondents violated the MBA by failing to pay Smith the minimum compensation set forth in Article 13.A.1.a (6) for the writings she delivered to Respondents on May 6, June 24, and July 1, 2022 in connection with the Project?

3.    Whether interest is due at the rate of 1.5% per month, as set forth in MBA Article 13.A.14, in connection with the balance of compensation due?

4..    Whether Respondents owe pension plan, health fund, and paid parental leave contributions pursuant to MBA Article 17?

5.    Whether interest is due at the rate of .83% per month pursuant to MBA Article 17.A and the Trust Agreements incorporated thereto on the unpaid pension plan and health fund contributions?

6.    If so, what is the appropriate remedy?

## BACKGROUND

On October 15, 2020, Kalligheri signed a Letter of Adherence binding the Company to the provisions of the 2020 MBA and a Guarantee Agreement in which he personally guaranteed the performance of the Company under the MBA [GX 3, 4.]  O'Sullivan signed a Guarantee Agreement on November 19, 2020 [GX 5].  Complainant Sarah Smith ("Smith") has been a WGA member since 2016 [TR. 47:21 – 48:1].

In February 2021, Smith received word from her agent that O'Sullivan, whom she knew through a mutual friend, and his producing partners were interested in having her direct an adaptation of Patricia Highsmith's novel, "This Sweet Sickness" [CX 1; TR. 51:13 – 52:24].  In his email to Smith's agent, O'Sullivan mentioned that the producers had obtained an option from the Highsmith estate.  He attached a script written by Nissar Modi but stated that the production team would be open to it if Smith "wanted to tackle a pass of the script herself" [CX 1].

At an initial meeting with O'Sullivan and his partners on February 16, Smith expressed interest in the film but stated that she did not want to use the script that had been drafted [TR. 55:5 – 56:25].  O'Sullivan understood that Smith wanted to create an outline from the novel rather than attempt to rework the original script [TR. 320:5-24].

Between April and October 2021, the parties exchanged emails regarding compensation for writing and directing services. The negotiation regarding the writing services had four elements: (1) a "rewrite," for which the parties ultimately agreed on a fee of $125,000; (2) a set of "guaranteed first revisions," for a fee of $85,000; (3) "optional second revisions" for $100,000, and (4) "optional polish" for $75,000 [GX 17; CX 20]. The overall deal included compensation for directing services, which Kalligheri testified were an essential component [TR. 435:18-22]. In his communications with Smith's agents, Kalligheri also mentioned the status of the option rights, stating, "We are simultaneously into conversations about partnering/transferring the option and original screenplay as well which we will have done prior to papering Sarah's deal" [CX 2].

On October 23, 2021, Kalligheri sent an email to Smith's agents, copying O'Sullivan, stating, "Confirming we are closed! Thanks guys. Look forward to next steps" [GX 17]. Kalligheri testified that in ordinary times he might wait to negotiate terms with a Smith until the option had successfully been transferred, but Respondents "didn't want to lose her as a director" and felt confident about the option, so they moved ahead [TR. 450:3-12].

On October 26, 2021, Smith sent an email to O'Sullivan and two of his partners stating in part, "I hear we're a go! … I'll be able to give this my full attention soon and will come back to you once I have a new outline first to make sure we're all on the same page before I get to scripting" [GX 18]. Russell Ackerman ("Ackerman"), one of the other producers, emailed back on November 30, 2021 to "check in to see how things are going – excited to discuss outline when ready" [GX 19]. Smith responded the same day, stating that she was "deep into the outline" and suggesting that they set a date before the holidays to discuss it [GX 20]. The parties set a meeting for December 16 for that purpose [GX 21]. Kalligheri testified that neither Ackerman nor anyone else other than himself had the authority to permit Smith to commence performance on the script, and that he never did so [TR. 449:7-14].

Smith testified that she rented an office, turned down other work and paid Jonako Donley, who was to work with her on the project, $12,500, or ten percent of the rewrite fee in November, once the deal terms were set [TR. 68:12-16; 75:25 – 76:5; CX 9]. In the meanwhile, her representatives contacted Kalligheri on November 26, December 7, and December 13 asking about the long form agreement [CX 11]. Kalligheri responded on December 13, stating, "We completely understand that she will not be turning anything in until we get her contract

done and officially commence her" [CX 17].

That same day, Smith sent an email suggesting they postpone the December 16 meeting: "I hear paperwork is coming. Should we push this call until then? It'll probably be a more efficient use of our time to do the call once we commence and I deliver the outline.  I know this time of year everything slows down so just holler if I need to give my lawyer a nudge" [GX 21].  Ackerman responded, "Ok sounds good – so lets connect in January or when the paperwork is done" [Id.].  In a follow-up email exchange in early January, Smith stated that her outline was "ready to share" but that she had been told to "press pause until at least some form of paperwork or retainer comes in" [Id.].  On January 17, 2022, Kalligheri reported that there had been "excellent progress just today on paperwork that's been holding us up" and promised an update shortly [Id.].

On January 28, having heard nothing further, Smith reached out to O'Sullivan to express her disappointment and ask, "[w]hat's going on with the deal?" [GX 22].  O'Sullivan responded, "I feel and share your frustrations. … I will resolve this paperwork delay that should have been cleaned up on the original underlying option months ago.  That's what I'm being told is the holdup and it's unacceptable…." [Id].  O'Sullivan and Smith made a plan to speak the following week [Id.].

On January 30, 2022, Kalligheri sent a message to Smith's agent with an update.  He stated:

> "We are waiting to execute a simple option assignment and extension agreement with the guys and then we will be commencing Sarah. It should be done already and I take full responsibility for the delay here.  I've put pressure on our lawyer to get it done this week. Money isn't our issue, and I'm happy to get her something in good faith once we control the option officially, as we work to paper her deal. Can't do anything without officially having the option and that's been the hold up" [GX 23].

Smith's agent replied, "Please keep us posted, it would be great if you would advance her something in good faith once the book option is finished and her deal is being papered. She has done the outline already and is waiting to turn it in until the deal is papered" [Id.].

In February 2022, O'Sullivan provided Smith with some updates by text message on the issue of the option extension [GX 24-27].  He stated that "all should be wrapped up shortly" and apologized for the delays [GX 24, 27].

On March 22, Kalligheri called Smith at O'Sullivan's urging. Smith expressed her frustration over not having received any money on the project, especially given the financial demands of supporting a family [TR. 97:15 – 98:10; 478:4-18]. Kalligheri explained that they could not move forward until the option issue was resolved, but promised her a payment of $30,000, which Kalligheri characterized as "a way to get her money, and … keep her with us and excited on the project" [TR. 481:8-10].

The following day, Jamie Lincenberg ("Lincenberg"), the Company's counsel, sent Smith's agent a Certificate of Authorship ("COA") along with a cover email promising to send the long form writing and directing agreements as soon as they were ready [GX 30].

Over the next several weeks, representatives of the parties exchanged communications and revisions to the COA. On March 29, 2022, Smith's representative Raymond Tambe ("Tambe") asked Lincenberg, "Can you confirm that your client will pay the writing fee based on the certificate (while we're negotiating the long form)" [GX 31]. Lincenberg responded, "The commencement payment (half of the fee) will be paid upon signature of the certificate with the other half on completion/delivery and a fully-executed long form agreement." She suggested that the long form agreement could be finalized "while [Smith] is writing" [Id.].

On March 31, Lincenberg emailed again to clarify her previous email: "Circling back to clarify, the payment upon signature of the cert will be half of the commencement payment (a quarter of the full rewrite fee [i.e., 31,250]). Apologies if my previous email caused any confusion [Id.]." Tambe asked if instead the "full commencement fee" could be paid on signature of the COA. Lincenberg replied on April 26, stating, "We are working on final paperwork to tie up chain of title with the underlying rights, so at this time cannot agree to pay more than half of the commencement payment upon signature of the certificate. If Sarah prefers to start writing once the chain of title is buttoned up then she can commence once the full commencement payment can be made …" [Id.]. After a few additional revisions, Smith signed the COA on May 6, 2022 [GX 31A].

The COA included language agreeing that the parties would "negotiate in good faith a long form agreement … incorporating the material deal terms dated as of October 19, 2021 …" [Id.]. The COA further stated, "As full and complete consideration for the writing services rendered pursuant to this Certificate, Company shall pay to [Smith] the sum of … $31,250 payable upon the execution of this Certificate" [Id.]. The COA also included the following provision:

This Certificate expresses the entire understanding of the parties hereto and replaces any and all former agreements, negotiations or understandings, written or oral, relating to the subject matter hereof.  Notwithstanding the foregoing, in the event of a conflict between this Certificate and the Agreement, the Agreement, once fully executed, shall control to resolve such conflict [Id.].

The same day she signed the COA, Smith sent a 28-page outline to the producers [GX 33, 33A].  The parties held a videoconference to discuss the outline on May 25 [GX 35].

On May 25, 2022, Smith's agent sent Kalligheri an invoice in the amount of $62,500 for "Commencement of 1st rewrite" [GX 37, 37A].  On June 6, Smith submitted a 35-page revised outline incorporating the notes from the May 25 meeting [GX 39, 41A; TR. 153:2-13].  Smith testified that the second draft added detail to the characters and their relationships, tightened plot developments and pacing, and incorporated additional themes in response to the feedback she had received [TR. 153:21 – 155:23].

As of that date, Smith had not received any payment, so her agent followed up with Kalligheri, who responded that he would check on the status [GX 37].  The agent followed up again on June 14 and June 22 [Id.].  On June 23, 2022, Smith sent Kalligheri a text message stating that she remained excited about the project but was "feeling pretty slighted that I haven't been paid anything" [GX 42].  Kalligheri responded that Smith's team was causing a holdup because they would not accept the "half of the first commencement payment" that they had agreed upon.  Smith agreed to communicate with her team that she had agreed to the lower initial payment [Id.].

Kalligheri then responded to Smith's agent, writing, "I'm waiting for the greenlight from our lawyer Tara.  She's been dealing with the rights holders" [GX37].  When Smith's agent questioned the delay, Kalligheri wrote,

Smith had agreed with me that she was ok with half of her first half planned commencement fee up front instead of the full first commencement payment (until we got the rights) which is why we did the COE, however after we negotiated the COE her team told our lawyer Tara Saller, no that isn't the case and they needed the full first commencement payment upfront upon signing of the COE which is where the hold up came up. Our investors will not approve a full first commencement until the rights are secured and I have been clear on that from the beginning [GX 38].

Smith met with the producers again on June 24 and received feedback on her revised outline [GX 41].  She submitted a 40-page third draft on July 1, 2022 incorporating those notes,

to which O'Sullivan responded, "Great stuff" and provided some additional thoughts [GX 44, 44A, 47; CX 55, 56]. On or about July 1, Kalligheri spoke with one of Smith's agents on the phone about the payment under the COA. Kalligheri testified that he reiterated that the payment due was $31,250, not the $61,500 that the agency had billed. He offered a choice between Smith being paid then for the lower amount or waiting for the rights issue to be resolved and paying her the higher amount then. Kalligheri testified that Smith's agent chose the latter [TR. 511:20 – 512:11]. Smith's agents did not send a revised invoice.

Smith met with O'Sullivan on July 25 to discuss casting [GX 46]. On October 7, 2022, Smith sent a text message to Kalligheri stating that she had not heard from O'Sullivan and that she still had not been paid [GX 49]. Kalligheri responded that the project was not dead, that they were continuing discussions with the estate about the rights, and that a co-producer had strung them along [Id.]. On October 10, O'Sullivan texted Smith and told her that he'd gotten to "the bottom of the mess" with the estate. He suggested that they connect by phone [GX 50].

On October 13, Smith and the producers met with representatives of the Highsmith estate about the Project. After the meeting, O'Sullivan and Smith agreed that it had gone well [GX 51]. However, in early November O'Sullivan learned that the estate would not approve the Project with Smith's involvement [GX 53]. O'Sullivan, Kalligheri, and the Company then withdrew their involvement.

On December 15, 2022, the Guild sent Kalligheri an email demanding payment to Smith in the amount of $331,866 plus interest and contributions to pension, health, and paid parental leave as set forth in the MBA [CX 72]. On April 1, 2024, Kalligheri emailed one of Smith's agents regarding the claim by WGAW [CX 68]. In it, Kalligheri wrote, "At the point that we walked away in solidarity with Sarah, she had not yet begun to write the script, and in fact she wrote a treatment even though it was not a contractual step in the contract we negotiated for her nor did we ask for it. She was being contracted to do a rewrite on a script by Nissar Modi as you may remember" [Id.].

On April 19, 2023, the Guild served a formal Notice of Claim [GX 7]. The Notice alleged that Respondents had improperly failed to pay Smith the MBA minimum compensation for three treatments ($121,866) and the guaranteed compensation for the rewrite and first revision as agreed to in October 2021 ($210,000). In addition, the claim sought interest and contributions to pension, health, and paid parental leave as set forth in the MBA [Id.].

**EXCERPTS FROM THE MBA [JX 1]**

ARTICLE 13 -- COMPENSATION

A.　　THEATRICAL

14. Payment of Compensation Under Deal Contract

Company will use its best efforts to pay writers employed to write on a deal basis not less than the applicable minimum within forty-eight (48) hours after the delivery of a completed story, treatment or original treatment, first draft screenplay or final draft screenplay, as the case may be, but in no event shall any such payment be made later than seven (7) days after delivery of such material. Payment shall not be contingent upon the acceptance or approval by the Company of the material so delivered. . . .

Company will pay interest of one and one-half percent (1.5%) per month when any initial compensation payment is due and not paid as provided. If the Company has failed to make such payment because the executed contract was not delivered by the writer to the Company, then no such interest is due. If the contract is not so delivered by the writer because of a dispute as to the terms of the contract and the Company shall be held to be wrong, the above-described interest payment shall be applicable.

ARTICLE 20 - SPECULATIVE WRITING

A. THEATRICAL

1. The Company and the Guild agree that there shall be no speculative writing, nor shall either party condone it as a practice. As used herein, the term "speculative writing" has reference to any agreement covered hereunder which is entered into between the Company and any writer whereby the writer shall write material, payment for which is contingent upon the acceptance or approval of the Company or upon the occurrence of any other event such as obtaining financing, or whereby the writer shall, at the request of the Company, engage in rewriting or revising any material submitted under the terms of this Basic Agreement and compensation for the writer's services in connection with such material is contingent upon the acceptance or approval of the Company, or upon the occurrence of any other event such as obtaining financing. Company shall not request a writer to write and submit literary material, other than a submission contemplated by Article 3.B.2. of this Basic Agreement, unless the Company first makes a commitment with the writer for the writing of at least a story or treatment. If the Company does so make a prohibited request, the writer shall not write and submit such material.

///

## POSITIONS OF THE PARTIES

Complainants assert that the parties' exchange of emails and agreement on essential terms in October 2021, combined with Smith's reasonable and detrimental reliance on Respondents' statements, created a binding and enforceable contract regardless of the parties' ultimate failure to reduce the terms to a long-form written agreement.  Under that agreement, they argue, Smith is entitled to the guaranteed amounts for the screenplay rewrite and first revision, as she was ready, willing, and able to perform the work.  They point out that there was nothing in the original deal terms or any subsequent agreement that made securing rights to the novel a condition precedent, and even if there were, such a condition would violate the MBA's Pay or Play provision. Complainants also contend that Smith is owed the MBA minimum payment set forth in the MBA for each of the three treatments she submitted on May 6, 2022, June 21, 2022, and July 1, 2022, plus MBA-mandated interest and contributions on the above sums.

Respondents maintain that, consistent with industry standard, the parties did not intend for an enforceable contract to exist unless and until a long-form agreement was executed. They argue that the deal points negotiated in October 2021 were missing an essential term, *i.e.,* the necessity of resolving the rights to the novel as a condition precedent, and that even if a contract was formed as of October 2021, the principal purpose of the agreement was frustrated by an "unanticipated supervening circumstance," and thus their performance was excused.  As to the claim for compensation for "treatments," Respondents argue that they did not engage Smith to write a treatment, and that the outlines she created were part of her own creative process in preparation for directing.  Whatever agreement may or may not have existed before May 2022, Respondents contend that the Certificate of Authorship superseded any previous agreements and that Smith is bound by the $31,250 payment she agreed to under the COA.  Respondents add that if any compensation is due, Respondents are not responsible for 1.5% monthly interest under MBA Article 13 because Smith never delivered a completed script.  Respondents further object to paying $10,200 in interest that accrued as a result of the Guild's requests for briefing extensions in this matter.

**OPINION BY THE ARBITRATOR**

Introduction

This is a claim for guaranteed compensation and for a flat deal screen minimum under the MBA.  The Guild maintains that there was a valid, enforceable contract under the terms the parties negotiated in October 2021, that the COA was intended to facilitate a commencement payment rather than supplant the original deal terms, and that Smith submitted three treatments which Respondents accepted.  Because Smith remained ready, willing, and able to perform the rewrite and first revision specified in the original deal terms, the Guild asserts that she is entitled to full payment for those items.  Respondents contend they owe Smith nothing because the COA is the only enforceable agreement between them and Smith and that payment under that agreement is excused by Smith's agents' failure to send a corrected invoice and by their statement that Respondents should wait for the rights to close before making payment.  Respondents argue they never asked for a treatment and that simply engaging creatively with Smith as part of her creative process did not obligate them to pay her.  A review of all the evidence and argument in this proceeding supports the position of the Guild with respect to the unpaid guaranteed compensation as set forth in the October 2021 deal but not the additional MBA minimum for the outlines/treatments she prepared in 2022.  The claim will be resolved accordingly.

Guaranteed Compensation

The evidence establishes Smith and Respondents reached an agreement on compensation for writing services on this Project.  Negotiations commenced in April 2021 and resulted in an agreement in October 2021 on (1) a rewrite for $125,000; (2) guaranteed revisions for $85,000; (3) optional second revisions for $100,000; and (4) optional polish for $75,000 [GX 17].  As held in prior arbitration awards under the MBA, agreements between writers and producers may be enforced without a fully executed written agreement, or even a written document at all.  Where parties have reached agreement on the essential terms of an agreement for services and a party commences work, a binding contract under the MBA exists.  *See, e.g., WGAW v. Anonymous Content, LLC, "Futha Mucka"* (Perea 2024, interim award); *WGAW et al. v. Cofrin, "Howard the Duck"* (Mosk 1982).  Even where, as here, the parties clearly intend to reduce their agreement to a detailed written document, the ultimate failure to do so does not

*Arbitrator's Opinion and Award*                    -12-
*WGA Case No. 22-CO-0200*

negate the validity of the initial contract [Id].

Once a contract for services was reached, Respondents became obligated under the MBA to pay Smith the guaranteed amounts in that deal. Article 20.A.1, Speculative Writing, Theatrical, provides:

> "The Company and the Guild agree that there shall be no speculative writing, nor shall either party condone it as a practice. As used herein, the term "speculative writing" has reference to any agreement covered hereunder which is entered into between the Company and any writer whereby the writer shall, at the request of the Company, engage in rewriting or revising any material submitted under the terms of this Basic Agreement and compensation for the writer's services in connection with such material is contingent upon the acceptance or approval of the Company, *or upon the occurrence of any other event such as obtaining financing. …*" [JX 1, emphasis added].

As the Guild points out, this language has consistently been held to require payment for services as long as the writer is ready, willing and able to perform, whether or not the material is submitted or accepted. *See WGAW v. Millennium Pictures, Inc. et al., "Homefront 2" and "Cold Warriors"* (Horowitz 2025); *WGAW et al. v. Ralph Andrews Productions, Inc. et al., "Miracle in Manila"* (Lorimer 1989)  Here, Smith remained ready, willing and able to carry out her duties in rewriting and revising the script for The Sweet Sickness. She is therefore entitled to the promised compensation.

Respondents argue the Pay or Play provisions of Article 20 do not apply in this case because obtaining the rights falls within "the occurrence of any other event" exception under Article 20.A.1. But the evidence fails to show that Respondents made obtaining the rights a condition precedent when consummating their deal with Smith and are estopped from arguing otherwise. The exchange of emails in October-November 2021 confirm that Respondents had clearly conveyed to Smith "we're a go" [GX 18-21]. Respondents were aware Smith promptly relied on their assurances by commencing work on the Project, turning down other work, and hiring a writer for assistance. Moreover, as events unfolded, Respondents never made it clear to Smith those rights could not be obtained until November 2022 when informed by Kalligheri the estate would not approve her involvement. In these circumstances, the claim by Respondents their deal is unenforceable because it is missing an essential term must fail.

Similarly unconvincing is the contention by Respondents that they do not owe Smith payment for the rewrite or revision because she was never formally commenced. Kalligheri

testified that he was the only person with authority to commence Smith on the Project, and that he never gave that authorization.  But the evidence convinces that Smith reasonably believed she was commenced to begin writing.  Ackerman, who had apparent if not actual authority, asked Smith when she would have an outline to share.  O'Sullivan repeatedly engaged with Smith on her written submissions and gave her feedback for future drafts.  In addition, the rationale for the execution of the COA was for Smith to be able to begin work on the rewrite, which is one of the customary ways in which writers are commenced.  Given that Smith and O'Sullivan proceeded as if she were formally commenced, a finding she had indeed been commenced is manifest.

Respondents further argue that they do not owe Smith for the full amount negotiated in October 2021 because the COA superseded the original deal and provided for a $31,250 payment as "full and complete consideration for the writing services rendered pursuant to this Certificate,"  Despite the inclusion of this "full and complete consideration" clause, the COA nonetheless specifically incorporates by reference the not-yet-drafted long form agreement to be based on the terms of the original October 2021 deal [CX 39].  Moreover, even after the COA was signed, the parties including Kalligheri continued to refer to the $31,250 payment as "half of her first half planned commencement fee" [CX 48].  This conduct further confirms the intention of Respondents to abide by the terms originally negotiated in their deal with Smith.  Accordingly, the claim the COA vitiated the agreement for compensation reached in October 2021 cannot be sustained.

Treatments

The Guild contends that Smith is entitled to a flat deal minimum payment for a treatment for each of the three items she submitted in 2022.  To prevail on this claim, the Guild must show (1) the treatments meet the contractual definition of a treatment, (2) were requested by Respondents, and (3) are covered by Article 20.A.1's prohibition on speculative writing. *Homefront 2*  at p. 10.  *See also WGAW v. Largo Entertainment, Inc., "Homepie"* (Roberts, 1995) ("*Homepie*"); *WGAW v. RGH/Lions Share Pictures et al., "Bad Kitty"* (Rosenthal, 2005) ("Bad Kitty").

On their face, it may be assumed the works that Smith produced meet the definition of "treatment" under the MBA.  Respondent Kalligheri referred to them as such more than once.  The evidence, however, fails to establish that the treatments were requested by Respondents

or that the creation of treatments was mutually considered to be a separate and compensable requirement.  In *WGAW. v. Paramount Pictures Corp*., *et al., Rewrite Grievances* (Knowlton, 2004) Arbitrator Knowlton distinguished between a completed piece of writing that a writer formally delivers versus the voluntary exchange of outlines and drafts so that the writer can get feedback during the process.  In the matters at issue in *Paramount,* producers accepted outlines and treatments from writers, engaged with them, and provided feedback.  Similarly in this case, based on Smith's own testimony, she prepared the treatments as part of her process for developing the script, or even potentially for the treatment to serve as the script itself.  The evidence does not convince that either party understood the treatments to be a required and separately compensable part of their deal.  As Smith explained during her testimony:

> "I wanted [Respondents] to approve the outline first so that when I get to scripting – which is a shorter leap, for me at least – then they would have less – would be less necessary for more revisions.  We could get the script done quickly.
> Q. So this is part of your creative process, right?
> A. Correct" [TR. 248:9-16].

Respondents accepted those treatments and engaged with them, but they did not indicate that the treatments were required.  In that respect, this case is distinguishable from the facts in *Homepie, Homefront 2, and Bad Kitty.*  The treatments Smith prepared more closely resemble the preparatory outlines and drafts at issue in *Paramount*. and are not separately compensable. In these circumstances, the Guild's claim for payment for the three treatments must be rejected.

Interest and Benefit Payments

Article 13.A.14. requires Respondents to pay interest on the unpaid initial compensation of $210,000 at the rate of 1.5% per month which continues to accrue until paid in full.  Payment thereunder is due within seven days of delivery.  Smith was terminated on November 15, 2022, thus interest under this provision began to accrue on November 23, 2022.  Respondents argue interest is excessive and punitive in this case, but this contention is belied by the express provisions of the MBA which require such payments.  As discussed at length in the Guild's Reply Brief at pp. 20-22, the 1980's arbitration decisions advanced by Respondents in support of this claim are not based on comparable facts nor vitiate the holdings in several more recent arbitration decisions upholding the application of the MBA rate of interest to unpaid compensation.

Article 17 of the MBA requires Respondents to make Pension Plan, Health Fund, and Paid Parental Leave contributions on behalf of Smith at the rates of 10.5%, 11.5%, and .5%, respectively [JX 1]. Interest on unpaid amounts under the MBA accrues at .83% per month [JX 1].

In the course of preparing closing briefs, the Guild sought and obtained multiple extensions over objections by Respondents from October 22, 2025, to December 12, 2025. In the unusual circumstances presented by those delays, the request by Respondents to toll interest on the unpaid compensation and benefit contributions during that period is granted.

<u>Conclusion</u>

The evidence in this proceeding supports the claim by the Guild that the parties formed an enforceable agreement in October 2021 under the MBA, and that by remaining ready, willing, and able to perform, Smith was entitled under the MBA to the guaranteed payments provided for in that agreement. Respondents, therefore, are liable for those amounts as well as the attendant benefit contributions and interest payments subject to tolling as described above. On the other hand, the evidence fails to sustain the claim by the Guild for compensation under the MBA for the treatments. An Award consistent with these findings shall issue.

**AWARD**

1.     Respondents breached the terms of an agreement between themselves and Smith by failing to pay overscale compensation in the amount of $125,000 for a rewrite of a theatrical motion picture screenplay and $85,000 for another rewrite.

2.     Respondents did not violate the MBA by failing to pay Smith the minimum compensation set forth in Article 13.A.1.a(6) for the writings she delivered to Respondents on May 6, June 24, and July 1, 2022 in connection with the Project.

3.     Interest is due at the rate of 1.5% per month, as set forth in MBA Article 13.A.14, in connection with the balance of compensation due subject to tolling from October 22, 2025, to December 12, 2025.

4.     Respondents owe pension plan, health fund, and paid parental leave contributions pursuant to MBA Article 17.

5.       Interest is due at the rate of .83% per month pursuant to MBA Article 17.A and the Trust Agreements incorporated thereto on the unpaid pension plan and health fund contributions subject to tolling from October 22, 2025, to December 12, 2025.

6.       The fees of the Arbitrator shall be borne equally by Respondents and the Guild in accordance with Article 11.A.5. of the MBA.  The Guild shall advance full payment to the Arbitrator of any outstanding fees, and Respondents shall reimburse the Guild forthwith for their one-half (50%) share of those fees.

DATED:  April  6, 2026
Santa Monica, California

_____
                FREDRIC R. HOROWITZ, Arbitrator